McKINSTER, Acting P. J.
*325 Defendant Brian Keith Koback walked into a rental car company office and stole a set of car keys. When confronted by *326 three employees in the parking lot, defendant told the men to back off or he would "fuck" them up. He then walked across the street. Undeterred, the three employees followed defendant to a motel parking lot where they again confronted defendant and demanded that he return the keys. Defendant made a tight fist around one of the key fobs, so that the ignition portion of the key was sticking out between his knuckles and, from within arm's reach, lunged at one of the employees while swiping or swinging at the employee's torso. Luckily, defendant did not make contact. When the employees backed off, defendant jumped a fence and tried to flee. Police officers arrived and pursued defendant. Officers subdued defendant after a brief struggle, during which three of the officers suffered minor injuries.
Defendant was charged with and convicted of robbery, assault with a deadly weapon, and resisting arrest. Defendant admitted he had suffered a strike conviction, and the trial court sentenced him to state prison for 14 years four months. On appeal, defendant argues: (1) his conviction for assault with a deadly weapon is not supported by substantial evidence because *678 there is no evidence he used the car keys in a manner that was capable of inflicting and likely to cause great bodily injury; (2) the trial court abused its discretion by imposing consecutive sentences on the robbery and resisting arrest counts, under the mistaken belief that it could only impose concurrent sentences if it struck defendant's strike prior; (3) the minutes of sentencing and abstract of judgment do not accurately reflect the oral pronouncement of sentence with respect to restitution and parole revocation fines; and (4) the minutes of sentencing contain a clerical error, in that they reflect that defendant admitted two strike priors instead of one.
In the published portion of this opinion, we conclude defendant's conviction for assault with a deadly weapon is supported by substantial evidence. A car key is not an inherently deadly or dangerous weapon, but if wielded as a makeshift weapon with sufficient force at close range, as defendant did here, a key is capable of puncturing skin and causing serious bodily injury.
In the unpublished portion of this opinion, we conclude the trial court erred when it concluded the only way it could impose concurrent sentences on defendant's robbery and resisting arrest convictions is if it first struck defendant's admitted strike prior. A trial court has discretion under the three strikes law to impose concurrent sentences if the current offenses occurred on the same occasion or arose from the same operative facts. We reverse the sentence and remand for the trial court to resentence defendant and to consider in the first instance whether concurrent sentencing is appropriate in this case. We agree with defendant that the minutes and abstract of judgment do not reflect the oral pronouncement of judgment with respect to the *327 restitution and parole revocation fines, and that the minutes inaccurately state that defendant admitted two strike priors. Because we reverse the sentence, we leave it to the trial court and the Department of Corrections and Rehabilitation to ensure that the minutes and abstract of judgment will accurately reflect whatever sentence the court imposes on remand.
I.
PROCEDURAL BACKGROUND
In an information, the People charged defendant with the following: assault with a deadly weapon other than a firearm, to wit, a key ( Pen. Code, § 245, subd. (a)(1), count 1); robbery ( Pen. Code, § 211, count 2); and (3) resisting arrest ( Pen. Code, § 69, count 3). The People alleged defendant suffered two prior prison terms ( Pen. Code, § 667.5, subd. (b) ), to wit: a 2013 conviction for possessing a controlled substance ( Health & Saf. Code, § 11377, subd. (a) ) and a 2011 conviction for attempted carjacking ( Pen. Code, §§ 664, 215 ). Finally, the People alleged defendant's 2011 conviction for attempted carjacking was a serious felony and a serious and violent felony. ( Pen. Code, §§ 667, subds. (a), (c), (e)(1), 1170.12, subd. (c)(1).)
A jury found defendant guilty on all three counts. In a bifurcated proceeding, defendant admitted his 2011 conviction for attempted carjacking was a strike. The trial court sentenced defendant to a total term of 14 years four months in state prison.
Defendant timely appealed.
II.
FACTS
On November 6, 2015, defendant walked into a rental car company office, grabbed a set of car keys from the front desk, and *679 walked out.[1] Chase,[2] an employee who was manning the front desk, learned what had happened from a customer and followed defendant into the parking lot. Chase told defendant to stop, and said, "Please give me the keys." Defendant kept walking away, pretended not to know anything about the keys, and reached into the pocket *328 of his sweatpants. Fearing defendant might be armed, Chase backed off and enlisted the help of two other employees who happened to be nearby, Agustin and Arthur. The three employees formed a wide circle around defendant to prevent him from leaving.
Chase and Agustin noticed that one of the keys was hanging out of defendant's pocket, and they demanded defendant return the keys. Defendant stopped and stood facing Agustin and Arthur from about two feet away. Chase backed off and stood about five feet behind defendant. Defendant appeared to be getting angry. Defendant again reached into his pocket, "like he was going to go for something." Defendant told the men to "back up" or "move," or he would "fuck" them up. He then began to walk away across the street. The employees then got into Arthur's car and followed defendant into a motel parking lot across the street.
The three men stood around defendant in the motel parking lot and again demanded that defendant return the car keys. Chase testified defendant stood "[a]bout a foot from arm's reach" away from the three men, but that Agustin was closest to defendant. Agustin testified defendant stood two to three feet away from him, and was within arm's reach. Defendant asked, "You want the keys?" He then took the car keys from his pocket, made a tight fist, and held one of the keys with the "sharp" or ignition end of the key sticking out between his knuckles. Defendant then "charged," "came at," or "lunged" at Agustin and "swung" or "swiped" the key at Agustin's torso. Arthur described defendant's motion like "throwing a punch." Agustin testified he was nervous and afraid that he might get hurt because defendant swung the key at him "with force." Chase testified he did not believe defendant was close enough to Agustin to actually make contact. But Agustin testified he was not hit "because my nephew [i.e., Arthur] pulled me back." Arthur testified, "If I didn't move [Agustin], he probably would have got hit." The three men backed away from defendant.
Defendant then put the keys back into his pocket, took off, and scaled the wall behind the motel. The employees got back into the car and found defendant as he walked along one of the streets behind the motel. They followed defendant by car through a small area of shops and streets for about 40 minutes, until law enforcement arrived and took over the chase. Several deputies chased down and subdued defendant. Defendant resisted, and three deputies were injured in the process.
Defendant testified he found the car keys next to a bus stop. Defendant ran from the police because he feared for his life. He denied taking the car keys from the rental car company office, denied resisting arrest, and denied that he swung the keys at Agustin.
*680 *329 III.
DISCUSSION
A. Substantial Evidence Supports Defendant's Conviction for Assault with a Deadly Weapon.
Defendant argues his conviction for assault with a deadly weapon is not supported by substantial evidence because he did not use the car keys-an object that is not inherently deadly or dangerous-in a manner that was capable of causing and likely to result in serious bodily injury. On this record, we conclude defendant did, in fact, use the car keys as a deadly weapon.
Our standard of review is well settled. "We ' " 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence-that is, evidence which is reasonable, credible, and of solid value-such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' [Citation.]" ( People v. Brooks (2017) 3 Cal.5th 1, 57, 219 Cal.Rptr.3d 331, 396 P.3d 480.)
" ' " 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " [Citations.]' " ' " ( People v. Harris (2013) 57 Cal.4th 804, 849-850, 161 Cal.Rptr.3d 364, 306 P.3d 1195.) " 'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict. [Citations.]' " ( People v. Manibusan (2013) 58 Cal.4th 40, 87, 165 Cal.Rptr.3d 1, 314 P.3d 1.)
"As used in [Penal Code] section 245, subdivision (a)(1), a 'deadly weapon' is 'any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury. [Citation.]' Some few objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law; the ordinary use for which they are designed established their character as such. [Citation.] Other objects, while not deadly per se, may be used, under certain circumstances, in a manner likely to produce death or great bodily injury. In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, *330 and all other facts relevant to the issue. [Citations.]" ( People v. Aguilar (1997) 16 Cal.4th 1023, 1028-1029, 68 Cal.Rptr.2d 655, 945 P.2d 1204 ( Aguilar ).)
" ' "When it appears ... that an instrumentality ... is capable of being used in a 'dangerous or deadly' manner, and it may be fairly inferred from the evidence that its possessor intended on a particular occasion to use it as a weapon should the circumstances require, ... its character as a 'dangerous or deadly weapon' may be thus established, at least for the purposes of that occasion." [Citation.]' ( People v. Graham (1969) 71 Cal.2d 303, 328 [78 Cal.Rptr. 217, 455 P.2d 153], quoting People v. Raleigh (1932) 128 Cal.App. 105, 108-109 [16 P.2d 752] )" ( People v. Page (2004) 123 Cal.App.4th 1466, 1471, 20 Cal.Rptr.3d 857 ( Page ); accord, People v. McCoy (1944) 25 Cal.2d 177, 188-189, 153 P.2d 315.)
*681 "Because [the] definition [of deadly weapon] focuses on potentiality, the People need not prove an actual injury to a victim, or even physical contact between the defendant and a third person, in order to substantiate a conviction for assault with a deadly weapon other than a firearm. [Citation.]" ( In re D.T. (2015) 237 Cal.App.4th 693, 698, 188 Cal.Rptr.3d 273.) The question is whether the weapon was used in a way that was likely to cause significant or substantial injury. ( People v. Beasley (2003) 105 Cal.App.4th 1078, 1087, 130 Cal.Rptr.2d 717.) "Permanent or protracted impairment, disfigurement, or loss of function" need not have been the likely outcome of the assault. ( Ibid . ) Whether a defendant used a deadly weapon (or used deadly force, for that matter) ultimately "turns on the nature of the force used. ... '[A]ll aggravated assaults are ultimately determined based on the force likely to be applied against a person.' [Citation.]" ( Aguilar , supra , 16 Cal.4th at p. 1035, 68 Cal.Rptr.2d 655, 945 P.2d 1204.)
" '[A]n instrument can be a deadly weapon even if it is not actually used with deadly force.' ( People v. Page , supra , 123 Cal.App.4th at p. 1472 [20 Cal.Rptr.3d 857].) Consequently, multiple California courts have affirmed convictions under Penal Code section 245, subdivision (a)(1), when the deadly weapon used was 'some hard, sharp, pointy thing that was used only to threaten, and not actually used to stab.' ( Page , at p. 1472 [20 Cal.Rptr.3d 857].)" ( In re D.T. , supra , 237 Cal.App.4th at p. 699, 188 Cal.Rptr.3d 273.) It is for the jury to decide the factual question of whether an instrument that is not inherently dangerous qualifies as a deadly weapon. ( People v. Moran (1973) 33 Cal.App.3d 724, 730, 109 Cal.Rptr. 287.)
Defendant swung or swiped the car key at Agustin's torso "with force." Agustin was standing within arm's reach of defendant, and defendant likely would have struck Agustin if Arthur had not pulled him back in time. The testimony was that Agustin was clothed and was wearing a polo shirt. But there was no testimony that Agustin was wearing anything under the shirt or *331 that the shirt was tucked into his pants. And there is nothing in the record to suggest defendant would not have continued to swing the car key at Agustin if he and the other men had not backed off, or that defendant would only have swung at Agustin's torso and would not have swung for his face or neck. Defendant was agitated and angry, and he threatened to "fuck" the men up. On this record, a reasonable jury could conclude that defendant used the car key in such a way that it was capable of producing and likely to produce great bodily injury.
We believe this case is similar to People v. Simons (1996) 42 Cal.App.4th 1100, 50 Cal.Rptr.2d 351 ( Simons ). The defendant in that case held several armed police officers at bay with a screwdriver, an object the court described as "not an inherently deadly weapon." ( Id . at p. 1107, 50 Cal.Rptr.2d 351.) Although instructed to drop the tool, the defendant flailed it about and urged the officers to shoot him. On those facts, the court found that for purposes of the crime of exhibiting a deadly weapon to prevent arrest ( Pen. Code, § 417.8 ), "[t]he evidence clearly demonstrated that the screwdriver was capable of being used as a deadly weapon and that defendant intended to use it as such if the circumstances required." ( Simons , at p. 1107, 50 Cal.Rptr.2d 351.) Like a screwdriver, a car key is not an inherently deadly weapon. But if wielded with sufficient force, a screwdriver or car key can puncture skin and cause significant injuries.[3]
This is not the first time our court has relied on Simons when concluding a instrument *682 that is not inherently deadly was used as a deadly weapon. In Page , supra , 123 Cal.App.4th 1466, 20 Cal.Rptr.3d 857, the defendant and his female accomplice robbed the victim and, after rifling the victim's pockets for his wallet, the female accomplice held a sharp pencil to the victim's neck and told him not to call the police. ( Id . at pp. 1468-1469, 20 Cal.Rptr.3d 857.) The defendant *332 challenged his conviction for assault with a deadly weapon contending the pencil was not a deadly weapon. ( Id . at p. 1470, 20 Cal.Rptr.3d 857.) Relying on Simons and similar cases, this court concluded the accomplice used the pencil in such a manner that it was capable of producing serious bodily injury and, therefore, that under the facts of that case the pencil was a deadly weapon as a matter of law. ( Id . at pp. 1470-1473, 20 Cal.Rptr.3d 857.) We rejected the suggestion that Simons was distinguishable simply because it did not address the aggravated assault statute. " '[N]o sound reason appears to define a "deadly weapon" for purposes of [Penal Code] section 245 differently than it is defined in other contexts under other statutes.' [Citations.] Cases discussing the definition of a deadly weapon routinely rely on other cases dealing with different statutes. [Citations.]" ( Page , at p. 1472, 20 Cal.Rptr.3d 857.)
More recently, In re D.T. , supra , 237 Cal.App.4th 693, 188 Cal.Rptr.3d 273, the juvenile court found that a minor committed an assault with a deadly weapon when he poked a classmate in the back with the sharp end of a pocketknife. The victim testified, "[t]he knife felt 'sharp' and 'pointy,' and [she] felt some pain. She did not think minor would hurt her, or that he was trying to cut or kill her. However, the victim was scared that an injury might occur because minor had a knife pressed to her back." ( Id. at p. 697, 188 Cal.Rptr.3d 273.) The investigating officer testified that similar knives can cause serious injury or death. ( Ibid . )
On appeal, the minor in In re D.T. , supra , 237 Cal.App.4th 693, 188 Cal.Rptr.3d 273, argued that the knife was not likely to cause death or great bodily injury. Relying on our decision in Page and on Simons , we disagreed. "[I]n Page this court found a pencil, which is less sharp and less likely to cause serious harm than a knife, to be a deadly weapon when it was held against a victim's throat without any slicing or stabbing motions. ( People v. Page , supra , 123 Cal.App.4th at p. 1472 [20 Cal.Rptr.3d 857].) Even more supportive of our point is People v. Simons (1996) 42 Cal.App.4th 1100, 1106-1107 [50 Cal.Rptr.2d 351], in which the court held that a screwdriver was a deadly weapon even though the defendant had only brandished it at police officers without actually touching *683 anyone. If a pencil held to a victim's neck, and a screwdriver that is only used to threaten from a distance , are both likely to cause death or serious bodily injury, then so is a sharp knife held to the back of a victim. As we have explained, the test is whether the knife was ' "used in such a manner as to be capable of producing and likely to produce , death or great bodily injury." [Citation.]' ( Aguilar , supra , 16 Cal.4th at pp. 1028-1029 [68 Cal.Rptr.2d 655, 945 P.2d 1204], italics added.) Because the knife was sharp, and because minor held it against the victim in such a way that a sudden distraction or misstep could have resulted in a serious puncture wound, the knife had the capacity to cause serious bodily injury or death. It *333 therefore meets the Aguilar standard for likelihood."[4] ( In re D.T. , at pp. 700-701, 188 Cal.Rptr.3d 273, first italics added, second italics in original.)
As in Page and In re D.T. , we continue to find Simons persuasive. If using a screwdriver to fend off police officers from a distance is an assault with a deadly weapon, then forcefully swinging or swiping a car key from a short distance is also an assault with a deadly weapon.
B.-C.**
IV.
DISPOSITION
The sentence is reversed. At resentencing, the trial court must consider whether concurrent sentences on counts 1 and 3 are appropriate pursuant to Penal Code sections 667, subdivision (c)(6), and 1170.12, subdivision (a)(6).
In all other respects, the judgment is affirmed.
I concur:
MILLER J.

The set consisted of two car keys attached to key "fobs," and a tag from the rental car company, on a wire ring.

We refer to the three witnesses by their first names only, and we mean no disrespect in doing so. We point out that the record includes different spellings of the same witnesses, i.e., Agustine/Agustin and Arthur/Arturo. We will use Agustin and Arthur, respectively.

There is no doubt that a key may be used as a defensive or offensive weapon. (See, e.g., State v. Labrum (Utah Ct.App. 2014) 318 P.3d 1151, 1153 [after defendant hit his wife, she "positioned the set of keys so that an individual key was protruding between each of her fingers"]; Sharp v. Kelsey (W.D.Mich. 1996) 918 F.Supp. 1115, 1119 [courtroom officer testified a belligerent attorney "came toward him clutching a set of keys in her fist with individual keys protruded from between her fingers like prongs, in a manner he had seen in self-defense classes"].)
An Internet website dedicated to women's self-defense advises that women hold a key "between your thumb and forefinger in order to use it like a short knife that you can use to cut an assailant's face," rather than "hold[ing] it between your fingers like an improvised knuckle duster." According to this resource, "Most assaults happen at close range and you will probably not be given the room to make a solid, effective strike, whereas you will probably be able to get a hand to your attacker's face and be able to drag the key across their eyes, nose, cheek and throat etc. in a cutting action." (See SEPS, Situation Effective Protection System for Women's Self-defense at < http://www.womensselfdefense-seps.com/womensselfdefense-course-module7.html> [as of July 17, 2018].)

To be sure, the pocket knife used by the minor in In re D.T. is different than a car key because, by definition, a pocket knife has a pointed blade that is designed to cut.
The court in In re Brandon T. (2011) 191 Cal.App.4th 1491, 120 Cal.Rptr.3d 637 held that a butter knife "with a rounded end and slight serrations on one side" was not used as a deadly weapon when the minor tried to cut the victim by slashing his neck, but failed because the blade broke. (Id . at pp. 1496-1498, 120 Cal.Rptr.3d 637.) To the extent that decision suggests that a key or similar instrument is not capable of being used as a deadly weapon simply because it lacks a knife-life "pointed" end, we respectfully decline to follow it. More recently, the court in In re B.M. (2017) 10 Cal.App.5th 1292, 217 Cal.Rptr.3d 294 expressly disagreed with In re Brandon T . and held that a butter knife with small ridges on one end is capable of being used as a deadly weapon. (In re B.M. , at pp. 1298-1300, review granted July 26, 2017, S242153.)

See footnote *, ante .